**Tommy HART, Petitioner–Appellant,**

v.

**Allan A. STAGNER,
Respondent–Appellee.**

No. 86–2793.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 12, 1991.

Decided June 3, 1991.

Margaret J. King, Paul S. Franco, Legal Interns, University of Idaho College of Law, Moscow, Idaho, for petitioner-appellant.

Clifford K. Thompson, Jr., Deputy Atty. Gen., San Francisco, Cal., for respondent-appellee.

Before FLETCHER, NORRIS and TROTT, Circuit Judges.

TROTT, Circuit Judge:

Tommy Hart appeals the denial of his petition for a writ of habeas corpus. He raises three claims relating to two trials arising out of a single 28–count information: (1) the district court should have reviewed the entire state court record in conducting harmless error analysis of a jury instruction; (2) the instructional error was not harmless; and (3) his Sixth Amendment right to a fair trial was violated because of extensive pretrial publicity that prejudiced the jury. We affirm.

I

On the afternoon of June 30, 1980, Hart and codefendant Larry Clay went to the home of Mrs. Paula H and her husband. The Hs had a sign outside their multistory home advertising a room for rent. Hart and Clay gained admission by telling Mrs. H they wanted to see the room. After looking at the room, Clay produced a gun and demanded money. Hart told Clay to let Mrs. H get the money out of her desk. She pointed to a small cash box, which Hart took. Holding the gun to Mrs. H's head, Clay pushed her into one of the rooms she had shown them. Hart entered the room and shut the door behind them. Clay stated in crude terms that he was going to sodomize Mrs. H, and then did so. Next, Hart raped Mrs. H while Clay held the gun. They then tied up Mrs. H and left.

That evening, Hart, Clay, and two others, Bobby Varner and Frank White, broke into a nursing home for the asserted purpose of stealing a safe. Hart climbed in through an open window in the nursing home and opened the door for the other three. When the night supervisor appeared, Clay struck him in the head with his gun. Varner and White went up to the second floor, entering the rooms of elderly residents and demanding money. Clay apparently stayed on the first floor, robbing and beating several residents. Margaret T, a 67–year–old blind woman, was raped in the first-floor bathroom and subjected to forcible oral copulation. Although she could not positively identify her assailant because of her blindness, Mrs. T believed he was clean shaven and of medium or light build. Varner, White and Clay all had facial hair or were heavy. White testified that when he returned to the first floor, after finishing his activities on the second floor, he saw Clay standing over some of the residents holding a gun but did not see Hart or Mrs. T. Unlike many of the other residents, Mrs. T did not suffer any head injuries.

Hart was tried in two separate trials, the first involving the sexual assault on Mrs. H, the second involving the nursing home incident. In the first trial, Hart was convicted of raping, sodomizing, and robbing Mrs. H, as well as related crimes not relevant to this appeal. In the second trial, in which he was tried jointly with his three codefendants, Hart was convicted of multiple counts of burglary, armed robbery, attempted robbery and assault. In the same proceeding, Hart alone was convicted of the forcible oral copulation and rape of Margaret T. At both trials, the jury was instructed that it could convict Hart of aiding and abetting if it found that Hart had knowledge of his codefendants' criminal purpose.

Hart's convictions were affirmed on direct appeal. *People v. Clay*, 153 Cal. App.3d 433, 200 Cal.Rptr. 269 (1984). Hart's habeas petition to the California Supreme Court was denied without opinion. Hart then filed a petition for writ of habeas corpus in federal district court, challenging the instruction in each trial on aiding and abetting, and asserting jury bias due to pretrial publicity. The district court denied the petition, and Hart timely appeals.

## II

The first and primary issue presented by this appeal is whether the district court must review the *entire* state court record to determine if a jury instruction determined to be defective was harmless error.

In both of Hart's trials, the court gave the jury an instruction on aiding and abetting (CALJIC 3.01) that the California Supreme Court subsequently found constitutionally deficient. *See People v. Beeman*, 35 Cal.3d 547, 199 Cal.Rptr. 60, 674 P.2d 1318 (1984). The instruction was defective because it allowed the jury to *infer* intent from knowledge, and relieved the prosecution of the burden of proving the *mens rea* of the charged crime.[1] After *Beeman*, we held that use of this constitutionally defective instruction could be harmless error. *Willard v. California*, 812 F.2d 461, 464 (9th Cir.1987); *Martinez v. Borg*, 937 F.2d 422, 423 (9th Cir.1991); *see also United States v. Rubio–Villareal*, 927 F.2d 1495 (9th Cir.1991).

In reviewing the record to determine whether the instruction was harmless in the present case, the district court had only portions of the state court record submitted by the state, not the complete record. The district court initially ordered the state to submit a transcript of all portions of the trial relevant to the issues Hart raised in his habeas petition. The state offered to provide the 558 page transcript of the voir dire examination and the 1,334 page transcript of Hart's two trials, but this offer was rebuffed. The district court again requested the "relevant" portions of the record, and the state submitted only portions of these transcripts deemed relevant: 99 pages of voir dire examination, 49 pages of the first trial, and 115 pages of the second trial. The state also provided the court with a 13 page excerpt from its brief filed in Hart's state appeal, as a guide to the transcript pages. Based on those

transcripts, the district court denied Hart's petition.

Hart argues that, in order to engage in harmless error analysis, the district court should have reviewed the *entire* state court record. He relies on a line of Ninth Circuit cases, beginning with *Ruff v. Kincheloe*, 843 F.2d 1240, 1242 (9th Cir.1988), which hold that in order to review this type of instructional error, the district court must review the entire record. *See Vicks v. Bunnell*, 875 F.2d 258 (9th Cir.1989) (remanding to district court to obtain entire state court record before conducting harmless error analysis of *Beeman* error). Although Hart is correct in arguing that the *Ruff* line of cases supports his position, we believe that the Supreme Court's intervening opinion in *Carella v. California*, 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989), and our circuit's endorsement of Justice Scalia's concurring opinion in *Carella*, change the analysis.

The habeas petitioner in *Carella* was convicted of grand theft for failure to return a rental car. The jury instruction was found constitutionally defective because it created a mandatory presumption that Carella had embezzled the car because he failed to return it within five days of the end of the rental period. In finding harmless error analysis appropriate, the court noted that where "the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not *intend* to cause injury," the instruction could be harmless. *Id.* at 266, 109 S.Ct. at 2420–21 (emphasis in original). Though the Court did not provide a clear definition of the term "predicate facts" in *Carella*, we understand it to mean those facts that the jury necessarily must have found in order to convict the defendant under the instructions it received from the court. *See Martinez*, 937 F.2d at 424.

In deciding *Ruff* in 1988, this court concluded that a federal judge making a harmless error determination must always re-

---

1. CALJIC 3.01 provides:
   A person aids and abets the commission of a crime if, with knowledge of the unlawful pur-

   pose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime.

view the entire state court record. The panel based its conclusion on then existing Supreme Court decisions, referring specifically to *United States v. Hasting,* 461 U.S. 499, 509 n. 7, 103 S.Ct.1974, 1981 n. 7, 76 L.Ed.2d 96 (1983). Justice Scalia in 1989 in *Carella* also chose *Hasting* as a point of reference, but he distinguished it from situations involving deficient instructions.

I write separately, however, because the Court has only implicitly acknowledged … what should be made explicit—that the harmless-error analysis applicable in assessing a mandatory conclusive presumption is wholly unlike the typical form of such analysis. In the usual case the harmlessness determination requires consideration of "the trial record as a whole," *United States v. Hasting,* 461 U.S. 499, 509 [103 S.Ct.1974, 1980, 76 L.Ed.2d 96] (1983), in order to decide whether the fact supported by improperly admitted evidence was in any event overwhelmingly established by other evidence, see, *e.g., Milton v. Wainwright,* 407 U.S. 371, 372–373 [92 S.Ct. 2174, 2175–2176, 33 L.Ed.2d 1] (1972); *Harrington v. California,* 395 U.S. 250, 254 [89 S.Ct. 1726, 1728–29, 23 L.Ed.2d 284] (1969). Such an expansive inquiry would be error here, and I think it important both to explain why and to describe the mode of analysis that is appropriate.

*Carella,* 491 U.S. at 267, 109 S.Ct. at 2421 (Scalia, J., concurring) (citation omitted).

Describing the limits of harmless error analysis "with greater particularity than had the majority," *United States v. Lopez,* 885 F.2d 1428, 1435 (9th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 748, 107 L.Ed.2d 765 (1990), Justice Scalia explained in his concurrence that concern over invading the jury's function as factfinder "necessarily circumscribe[s] the availability of harmless-error analysis when a jury has been instructed to apply a conclusive presumption." *Carella,* 491 U.S. at 269, 109 S.Ct. at 2422. To analyze the effect of a jury instruction that improperly shifts the burden away from the prosecution, the reviewing court may look only to those predicate facts necessarily found by the jury in convicting the defendant, and then determine whether the jury must have also found the element on which the jury instructions were deficient. For example, having found that Carella had kept the car, could the jury have found that he did not have the intent to steal the car? If the jury must necessarily have found that Carella intended to steal the car, the instructional error was harmless. The Court remanded for consideration of this question.

Because this type of harmless error analysis is limited to a determination of what the jury *necessarily* found to reach the verdict it reached based on the instructions given, the reviewing court should restrict its review of the record to those portions that are relevant to that inquiry. The reviewing court's task is not to determine whether a reasonable jury could convict on the evidence before it or whether the reviewing court would do so based on the record as a whole. The questions it must answer are much more focused: First, based on the instructions given, what *must* the jury have found to convict? Second, in making those findings, did it necessarily find all the required elements of the charged crime? The reviewing court should examine those parts of the record relevant to these inquiries. This is the essence of Justice Scalia's statement in his concurrence that "consideration of 'the trial record as a whole' … would be error" in analyzing this type of instructional deficiency. *Id.* at 267, 109 S.Ct. at 2421 (quoting *United States v. Hasting,* 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983). The district court may look only at those portions of the state court record that are relevant to proof of the predicate facts. To go beyond such a limited inquiry would improperly involve the court in reweighing the evidence and would invade the province of the jury. " '[T]he question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials.' " *Id.* 491 U.S. at 269, 109 S.Ct. at 2422 (Scalia, J., concurring) (quoting *Bollenbach v. United States,* 326 U.S. 607, 614, 66 S.Ct. 402, 406, 90 L.Ed. 350 (1946)).

We first applied Justice Scalia's approach to harmless error analysis for instructional deficiencies in *Leavitt v. Vasquez,* 875 F.2d 260, 261–62 (9th Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 186, 107 L.Ed.2d 141 (1989). *See Martinez,* 937 F.2d at 424–25. *Leavitt* involved exactly the same problem we confront in the present case: whether *Beeman* error can be found harmless. Although the court reviewed the entire record in *Leavitt,* under *Carella* it was not required to do so, unless it viewed the entire record as relevant to the predicate facts.

We believe, in light of *Carella,* that the *Ruff* rule requiring review of the entire record in order to conduct harmless error analysis is not applicable to the *Beeman* error in this case. Where the asserted error is misdescription of an element of the offense, as in the present case, or a conclusive presumption, as in *Carella,* the habeas court need only examine the relevant portions of the record. In the present case, Hart has not asserted on appeal that the district court failed to review all relevant portions of the state court record. His claim is simply that the district court erred in not reviewing the *entire* record.[2] Thus, the district court did not err in conducting a limited review.

### III

■ Hart argues the district court erred in finding that use of the defective instruction at both trials was harmless. We review de novo the district court's denial of a habeas corpus petition based on a determination that an erroneous jury instruction was harmless. *See Leavitt,* 875 F.2d at 261–62.

Under *Carella,* the error is harmless if, considering the predicate facts the jury must have found to convict Hart under the instructions it was given, the jury must have necessarily found the element on which the jury instructions were incorrect. We explicitly adopted Justice Scalia's *Car-*

ella test for *Beeman* error in *Martinez,* 937 F.2d at 424, as follows:

> "When the predicate facts relied upon in the instruction, or other facts necessarily found by the jury, are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making those findings is *functionally equivalent* to finding the element required to be presumed."

*Id.* 937 F.2d at 424 (quoting *Carella,* 491 U.S. at 271, 109 S.Ct. at 2423) (Scalia, J., concurring). As instructed under CALJIC 3.01, the jury was to convict Hart if, "with knowledge of the unlawful purpose of the perpetrator of the crime, he aid[ed], promote[d], encourage[d] or instigate[d] by act or advice the commission of such crime."

■ In Hart's first trial, in which he was convicted of robbing, raping and sodomizing Mrs. H, the predicate facts the jury necessarily found were that he was present, had knowledge of his codefendant's criminal intent, and actively assisted in the crimes by searching for Mrs. H's office after Clay demanded money, telling Clay to let Mrs. H get the money, closing the door and remaining in the room after Clay stated he was going to sodomize Mrs. H, then, himself, raping Mrs. H. The ultimate fact to be proved was that Hart intended to further Clay's criminal purpose. On these facts, no rational jury could have concluded that Hart was the person with Clay, that he knew of Clay's criminal purpose, but that he did not intend to aid Clay in the commission of these crimes. *See Leavitt,* 875 F.2d at 262–63 (instructional error regarding intent harmless where defendant and his brother armed themselves with hatchets and went to apartment where brother killed one victim, and defendant committed mayhem against another); *see also United States v. Belgard,* 894 F.2d 1092, 1095 (9th Cir.1989), *cert. denied,* — U.S. ——, 111 S.Ct. 164, 112 L.Ed.2d 129 (1990) (instructional error harmless where defendant's acts consistent only with intent

---

**2.** Hart did send a letter to the district court in which he asserted that the state had omitted portions of the transcript that were relevant to his arguments. However, in his appellate brief

and at oral argument, Hart failed to cite any relevant portion of the transcript that had been omitted.

to harm victim). Moreover, Hart's defense at trial did not concern his lack of criminal intent; he claimed that he was not present when the crimes against Mrs. H were committed. *See Hennessy v. Goldsmith*, 929 F.2d 511, 517 (9th Cir.1991) (instructional error harmless where not relevant to defense presented at trial); *see also Connecticut v. Johnson*, 460 U.S. 73, 87, 103 S.Ct. 969, 977–78, 74 L.Ed.2d 823 (1983) (instructional error on the issue of intent may be harmless where defense is alibi, not lack of intent). We conclude the instructional error in the first trial was harmless beyond a reasonable doubt.

In Hart's second trial, which concerned the events at the nursing home, he was convicted of rape and forcible oral copulation, as well as multiple counts of burglary, armed robbery, attempted robbery and assault. Because the prosecution alleged he was the only defendant who actually committed the rape and forcible oral copulation, and because he was the only defendant convicted of those charges, he must have been convicted as a principal, not as an aider and abettor. As to the other charges, however, he may have been convicted as an aider and abettor. Thus, we must again focus on the predicate facts necessarily found by the jury, and then determine whether any rational jury finding those facts could have failed to find Hart's actions were accompanied by the required *mens rea.*

█ The predicate facts that the jury must have found to convict Hart of these crimes were that he knew of his codefendants' criminal purpose, and acted to facilitate that purpose. Indeed, Hart was the first defendant to enter the nursing home, crawling in a window and opening the door for his codefendants. These facts permit

no other rational conclusion than that Hart intended to aid the commission of the crimes and thus acted with the required *mens rea.* Therefore, the instructional error on aiding and abetting was harmless beyond a reasonable doubt in the second trial as well.

### IV

█ Hart's final argument, which pertains only to the second trial, is that extensive pretrial publicity deprived him of his Sixth Amendment right to trial before a fair and impartial jury.[3] The determination of whether an individual juror was biased against the defendant is a factual determination that we presume correct in habeas corpus proceedings, under 28 U.S.C. § 2254(d). *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir.1988), *cert. denied,* — U.S. —, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990); *Patton v. Yount*, 467 U.S. 1025, 1038–39, 104 S.Ct. 2885, 2892–93, 81 L.Ed.2d 847 (1984). "[T]he constitutional standard of jury impartiality is a question of law" that we review de novo. *Harris*, 885 F.2d at 1361.

Hart relies on *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), in which the defendant was tried in the county adjoining the county in which the six alleged murders were committed. After the defendant was arrested, the county sheriff issued widely-publicized press releases stating that the defendant had confessed to the six murders. The Court noted that "a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him during the six or seven months preceding his trial." *Id.* at 725, 81 S.Ct. at 1644. This coverage was full of editorial commentary, characterizing the defendant as "remorseless and without

**3.** Hart also argues on appeal that the district court erred by failing to obtain, *sua sponte,* the complete record of the pretrial publicity that allegedly rendered his trial unfair. However, the district court ordered the respondent "to submit all available transcripts or tapes, if transcripts are unavailable, of television and radio reports concerning pretrial publicity of petitioner's trial...." The district court reviewed the transcripts of television coverage that were submitted pursuant to this order in addition to

dozens of relevant newspaper articles. Moreover, in evaluating the factual questions of whether individual jurors were prejudiced by pretrial publicity, the district court was not required to order production of the entire record unless Hart could not produce it himself. *See Austad v. Risley*, 761 F.2d 1348, 1353 (9th Cir.), *cert. denied,* 474 U.S. 856, 106 S.Ct. 163, 88 L.Ed.2d 135 (1985). Hart made no showing that he attempted to obtain the complete record yet was unable to do so.

conscience," a "confessed slayer of six." *Id.* at 726, 81 S.Ct. at 1644. The Court found this publicity resulted in a "pattern of deep and bitter prejudice" against the defendant. *Id.* at 727, 81 S.Ct. at 1645. Eight of the twelve jurors on the case admitted during voir dire that they believed the defendant was guilty. The Court held that the defendant had not received a constitutionally adequate trial and reversed the conviction.

Hart argues he was subjected to the same type of extensive and prejudicial publicity. However, his argument fails in the face of the Supreme Court's subsequent opinion in *Patton v. Yount,* in which the Court upheld the conviction of a defendant charged with the stabbing murder of a female high-school student in a rural Pennsylvania community. The *Patton* defendant confessed to the crime, and was convicted of first-degree murder and rape. The defendant was retried in the same county when his conviction was reversed on appeal. In the second trial, four years after the crime, the defendant was again convicted of murder. The Third Circuit granted the defendant's habeas petition, noting that the publicity had revealed his prior conviction, his confession, and that all but 2 of the 163 veniremen had heard of the case. 77% admitted that they would carry an opinion regarding the defendant's guilt into the jury box. Eight of the fourteen jurors on the case admitted that, at some time, they had formed some opinion regarding the defendant's guilt. One juror stated he would require evidence to overcome his belief in the defendant's guilt. *See id.* 467 U.S. at 1029–30, 104 S.Ct. at 2887–88.

In reversing the Third Circuit, the Court held that the publicity had not unfairly prejudiced the defendant, stressing the factual nature of the coverage, the passage of time since the crime, and concluding the jury was not inflamed by a "wave of public passion." *Id.* at 1033, 104 S.Ct. at 2889 (quoting *Irvin,* 366 U.S. at 728, 81 S.Ct. at 1645). The standard adopted by the Court was "not whether the community remembered the case, but whether the jurors at [the] trial had such fixed opinions that they

could not judge impartially the guilt of the defendant." *Patton,* 467 U.S. at 1035, 104 S.Ct. at 2890–91 (citing *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1642–43). The Court stressed the four years since the crime was committed, and noted that the voir dire testimony

> revealed that this lapse in time had a profound effect on the community and, more important, on the jury, in softening or effacing opinion. Many veniremen, of course, simply had let the details of the case slip from their mind[s].... [T]he record suggests that their passions had not been inflamed nor their thoughts biased by the publicity."

*Id.* 467 U.S. at 1033–34, 104 S.Ct. at 2890. The Court concluded that all the jurors, even those who had previously held an opinion regarding the defendant's guilt, were able to lay aside their prejudices and decide the case based on the evidence presented at trial. *Id.*

■ After *Patton,* the Ninth Circuit adopted a two-prong test for determining when a defendant's Sixth Amendment right to jury trial has been violated by excessive and unfair publicity. The defendant may show either (1) prejudice presumed because the community was "saturated with prejudical [*sic*] and inflammatory media publicity about the crime," *Harris,* 885 F.2d at 1361, or (2) actual prejudice from jurors who "demonstrated actual partiality or hostility that could not be laid aside," *id.* at 1363 (citing *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975)).

■ In the present case, there was substantial media coverage which "might have adversely affected the minds of the prospective jurors," as the district court found. "Of the twelve jurors and four alternates who served at the trial, only one had not heard of the case and all but two were exposed to the case through media coverage." However, the district court examined the voir dire transcript and agreed with the state trial court's determination that the jurors were impartial. Although nearly all of the jurors were familiar with

the case, they all stated credibly that they could put aside any preconceptions and arrive at a verdict based solely on the evidence presented at trial. We have reviewed the voir dire of the seated jurors, and we agree with the district court that the jurors did not demonstrate bias against the defendants. Accordingly, Hart has failed to establish actual prejudice.

Hart cannot establish inherent prejudice either, considering the community in which the crimes occurred, the nature of the crimes, and the anonymity of the victims. San Francisco is a large and cosmopolitan community in which crime is a commonplace of urban existence. *See United States v. Rewald*, 889 F.2d 836, 864 (9th Cir.1989), *amended on other grounds*, 902 F.2d 18, *cert. denied*, — U.S. ——, 111 S.Ct. 64, 112 L.Ed.2d 39 (1990) (although crime occurred in isolated state of Hawaii, no prejudice because not a small or rural community). Although the nature of the crimes, committed against helpless elderly people in the sanctuary of their home, aroused considerable community sentiment, it did not exceed that in *Patton* and hence did not constitute a deprivation of Hart's Sixth Amendment rights. If the Supreme Court did not find unconstitutional prejudice in *Patton*, which involved the murder of a female high-school student in a rural community, we cannot find such prejudice to Hart, who committed his crimes against otherwise unknown victims in an urban setting.

## V

For the reasons given above, the judgment of the district court is

AFFIRMED.